IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **DEREK WEIDE,** *et al.* | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Case No.: SAG-25-03566** |
| **v.** | * | |
| | * | |
| **CITY OF CUMBERLAND** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Derek Weide and Robert M. Iliff (collectively, "Plaintiffs") bring this action against their former employer, the City of Cumberland ("the City"), alleging hostile work environment and retaliation in violation of Title VII. ECF 1. The City has filed motions to dismiss, or, in the alternative, for summary judgment with respect to Weide's claims, ECF 12, and Iliff's claims, ECF 13, both of which Plaintiffs jointly opposed, ECF 15. The City then filed replies as to both Weide's and Iliff's claims. ECF 17, 18. Also pending is a motion to seal certain exhibits, ECF 22, which will be granted as unopposed. This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons explained below, both motions will be granted in part and denied in part.

## I.    BACKGROUND

The following facts are derived from Plaintiffs' complaint, ECF 1, and are assumed to be true for the purpose of these motions.

Plaintiffs both worked in the City's Flood Control Department. *Id.* ¶¶ 6–7. While Weide had been a long-term City employee, the City hired Iliff as a seasonal employee pursuant to a

contract running from late April, 2024 through October, 2024. *Id.* ¶¶ 12–13. Jeff Harden served as Plaintiffs' supervisor. *Id.* ¶ 10.

Sometime before May 6, 2024, Harden walked in on Weide while he was using the bathroom, causing Weide to feel afraid to use the bathroom at work. *Id.* ¶ 16. Then, on May 6, Harden told both Plaintiffs that he had had a sexual dream about them. *Id.* ¶ 17. Later that day, while Plaintiffs were working, Harden described the dream to them, stating that in the dream Weide had been trying to kiss Harden while Iliff had been watching. *Id.* ¶ 18. On May 10, in front of Iliff and another coworker, Harden told Weide that he had had another dream about him. *Id.* ¶ 19. When Weide responded, "come on man," Harden replied, "I had forgotten my Safeword." *Id.*

Three days later, Harden asked Weide whether Weide had been thinking about him over the weekend. *Id.* ¶ 20. When Weide asked why he would be thinking about Harden, Harden responded, "well because we're friends." *Id.* The following day, Weide told Harden that his comments were unwelcome, and Harden responded by telling Weide that he looked angry and instructing him to "let that go." *Id.* ¶ 21.

On or about May 14, while giving daily work assignments, Harden drew male genitalia in front of Weide, Iliff, and two of their male coworkers. *Id.* ¶¶ 22, 24. On occasions before that date, Harden had drawn other pictures of male genitalia and had begun to describe them to Weide before Weide had left the room. *Id.* ¶ 14.

On May 15, Weide reported Harden's conduct to the City and lodged a formal complaint. *Id.* ¶ 27. The City placed Harden on administrative leave and commenced an investigation that involved interviews with Plaintiffs, Harden, and their coworkers. *Id.* ¶¶ 30–31. Harden admitted to making the sexually explicit statements, and the City concluded that he had violated its Code of

Conduct prohibition on inappropriate or sexually suggestive behavior in the workplace. *Id.* ¶¶ 32–33. Following the investigation, the City reinstated Harden to his previous position supervising Plaintiffs on May 29, 2024. *Id.* ¶¶ 40, 49. The complaint alleges that during and after the investigation, the City did not follow its own "zero tolerance" policy, did not follow protocol by offering to transfer the complainants rather than the alleged perpetrator, did not implement interim preventive measures during the investigation, and failed to monitor Harden following his return to his position. *Id.* ¶¶ 35, 38–39.

Immediately upon Harden's return to his position, he began using "threatening overtones" against Iliff. *Id.* ¶ 50. At some point, Harden threatened Iliff, an incident about which the City's Human Resources Department ("HR") held a meeting but took no action. *Id.* ¶ 72. Following Harden's return, he and other supervisors also began "closely monitoring" Plaintiffs during their work to a degree that had not occurred before the investigation. *Id.* ¶¶ 51–54. Additionally, Harden began requiring the Flood Department workers to complete daily work planning forms. *Id.* ¶¶ 55–56. The City's Sewer Department workers, who were also supervised by Harden, had to complete these forms for only two weeks, while the Flood Department workers had to continue completing them. *Id.* ¶¶ 10, 56. Harden would orally change the daily work plan after the completion of these forms "to create discrepancies designed to support negative performance evaluations." *Id.* ¶ 57.

At various unspecified times, Plaintiffs had to perform "Dangerous and Retaliatory Work Assignments." *Id.* ¶¶ 59–62. Plaintiffs had to perform brush cutting in snake-infested areas. *Id.* ¶ 59. They were directed to handle hazardous paints without personal protective equipment, and when they requested such equipment, "Harden became angry." *Id.* ¶ 60. The City required Iliff to ride in a lift bucket without OSHA-mandated training. *Id.* ¶ 61. Weide was required to work during several heat advisories while Sewer Department workers "were allowed to seek relief from the

heat." *Id.* ¶ 62. And, on one occasion, another employee was told to "get out of the heat" and asked whether Iliff should also come inside, to which Mr. Dawson, an individual not otherwise referenced in the complaint, responded, "Oh no keep him out in the heat." *Id.* ¶¶ 63–64.

At some point, Weide requested leave pursuant to the Family and Medical Leave Act ("FMLA") based on anxiety from his experiences with Harden. *Id.* ¶ 67. The City denied his initial request, required him to undergo fitness-for-duty examinations, and, in late July, 2024, placed him on paid administrative leave until cleared to return to work "mentally." *Id.* ¶¶ 66–67. The City also restricted how Plaintiff was able to transport himself to the fitness-for duty examinations. *Id.* ¶ 68. HR repeatedly requested his private therapist notes and forced him to sign "right of information forms under duress" in November, 2024. *Id.* ¶ 69. Then in mid-December, the City placed Weide on unpaid administrative leave, despite an earlier letter stating that he would be on paid leave until late December. *Id.* ¶ 70.

The complaint further alleges that HR allowed rumors about the sexual harassment complaint and investigation to spread throughout the Sewer and Flood Departments. *Id.* ¶ 71. On one occasion, a Sewer Department employee "act[ed] like he's sucking on a penis" as Weide walked by. *Id.* ¶ 73. Additionally, Sewer Department employees received preferential treatment, including extended lunch breaks, compared to Flood Department employees. *Id.* ¶ 74.

In September, 2024, the City terminated Iliff's seasonal contract early. *Id.* ¶ 77. In past years, Iliff had always worked the full six-month contract term. *Id.* ¶ 78. That same month, Harden gave Weide his first negative annual performance evaluation in his seventeen years of employment with the City. *Id.* ¶ 75. The evaluation contained no reasons or examples. *Id.* Two days later, Harden quit. *Id.* ¶ 80.

4

Following Harden's departure, Weide was required to train his new supervisor and attend safety meetings with the Sewer Department. *Id.* ¶ 82. At some point thereafter, Weide was also required to clean "homeless camps containing needles and human feces," work that he had not previously been required to perform. *Id.* ¶ 84. Later, during a flood event in May, 2025, Weide had to work a thirty-two-hour shift while one pump station was unmanned in violation of safety protocols. *Id.* ¶ 85.

At some point thereafter, Weide's union voted to eliminate the Flood Department from its contract, requiring Weide to transfer to the Sewer Department. *Id.* ¶ 86. Weide resigned from City employment in August, 2025 in response to the "intolerable working conditions." *Id.* ¶ 89.

Plaintiffs each bring two claims against the City. Weide brings Count I, alleging "sexual harassment/hostile work environment," *id.* ¶¶ 93–100, and Count II, alleging retaliation, *id.* ¶¶ 101–06. Iliff brings Count III, alleging "sexual harassment/hostile work environment," *id.* ¶¶ 107–14, and Count IV, alleging retaliation, *id.* ¶¶ 115–20.

## II.    LEGAL STANDARDS

A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). But if a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555.

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The City's motion is styled as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56(a). A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible if two requirements are satisfied. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). First, the plaintiff must have "actual notice" that the motion may be disposed of as one for summary judgment. *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. *Id.* Second, the parties must have had a reasonable opportunity for discovery. *Greater Balt. Ctr. for Pregnancy Concerns*, 721 F.3d at 281. To demonstrate the lack of a reasonable opportunity for discovery, the nonmovant ordinarily must file

an affidavit or declaration pursuant to Rule 56(d) that explains the "specified reasons" that "it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).

## III. DISCUSSION

This Court must first determine whether to convert the City's motions into motions for summary judgment under Rule 12(d). The City expressly captioned their motions in the alternative such that Plaintiffs were on notice that conversion could occur. *See* ECF 12, 13. Both Plaintiffs filed affidavits pursuant to Rule 56(d), however, explaining the ways in which they have not yet had an adequate opportunity for discovery and specifying several issues pertinent to the City's motions that require discovery. ECF 15-1, 15-2. Accordingly, this Court concludes that Plaintiffs have demonstrated that they have not yet had a reasonable opportunity for discovery such that conversion under Rule 12(d) would be inappropriate. This Court will therefore construe the City's motions as motions to dismiss and will disregard the documents and exhibits outside the pleadings.

### A. Sexual Harassment/Hostile Work Environment Claims

To state a claim for sexual harassment based on a hostile work environment, the plaintiff must show (1) unwelcome conduct, (2) based on the plaintiff's sex, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment, and (4) imputable to the employer. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 117 (4th Cir. 2021). The City argues that Plaintiffs have failed to establish the second and third elements and that it is entitled to an affirmative defense as to the fourth element.

As to the second element, Plaintiffs have alleged that Harden's conduct included drawing and showing pictures of male genitalia to them and the other Flood Department workers, who are all male. Such allegations provide sufficient grounds, at this early stage of the case, for this Court to infer that the unwelcome conduct was because of Plaintiffs' male sex.

For conduct to be sufficiently severe or pervasive to create an abusive work environment under the third element, the work environment must be both objectively and subjectively hostile. *Id.* at 117–18. The court must consider the totality of the circumstances to determine whether a work environment is hostile. *Id.* at 118. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). A "disparity in power" is also a relevant consideration. *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007). No single factor is required. *Harris*, 510 U.S. at 23. Although "extremely serious" isolated incidents may be actionable, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), hostile work environment claims more often "are based on the cumulative effect of individual acts" involving "repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

This Court concludes that Plaintiffs have sufficiently alleged this element at this early stage. There existed a significant disparity in power in that Harden served as Plaintiffs' supervisor. And, although Harden's alleged conduct was not physically threatening (with the possible exception of Weide's allegation that Harden walked in on him while he was using the bathroom, making Weide afraid to use the bathroom at work), it was humiliating in that Harden, Plaintiffs' supervisor, allegedly described them as participants in his sexual dreams in front of their coworkers. Moreover, Harden allegedly engaged in repeated conduct of this sexual type over the course of at least a two-week period until Weide lodged a formal complaint about it. At this stage, these allegations suffice to show that the conduct was sufficiently severe or pervasive.

Finally, as to the fourth element, an employer is vicariously liable if the plaintiff's supervisor creates the hostile environment. *Faragher*, 524 U.S. at 807. The employer is entitled to

an affirmative defense, however, when no tangible employment action is taken, the employer acted with reasonable care to promptly prevent and correct the sexually harassing behavior, and the employee unreasonably failed to take advantage of the preventive or corrective opportunities provided or otherwise avoid the harm. *Id.* A court may not reach an affirmative defense in deciding a Rule 12(b)(6) motion to dismiss unless all facts necessary to establish the defense are alleged in the complaint. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

Harden served as Plaintiffs' supervisor, and although Plaintiffs allege that the City promptly began investigating Weide's complaint, they also allege that the City did not follow its own "zero tolerance" policy, did not follow protocol by offering to transfer the complainants rather than the alleged perpetrator, did not implement interim preventive measures during the investigation, and failed to monitor Harden following his return to his position. Thus, the complaint does not establish that the City acted with reasonable care, and this Court may not reach the *Faragher* affirmative defense at this stage. The City may raise this affirmative defense again, as appropriate, as this case proceeds.

Accordingly, Plaintiffs have sufficiently stated claims for sexual harassment/hostile work environment.

### B. Retaliation Claims

A Title VII retaliation claim requires a plaintiff to show that (1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) a causal link between those two events exists. *Savage v. Maryland*, 896 F.3d 260, 276 (4th Cir. 2018). The employer's adverse actions must "be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). The plaintiff may establish causation through either

temporal proximity or other evidence indicating retaliatory conduct and animus. *Johnson v. Baltimore City*, 163 F.4th 808, 819 (4th Cir. 2026). Absent other evidence of causation, however, courts generally consider adverse actions more than two months removed from protected activity to be too remote. *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025). At the motion to dismiss stage, a plaintiff need not establish a prima facie case of retaliation; rather, he must satisfy only the requirement to state "a claim to relief that is plausible on its face." *Johnson*, 163 F.4th at 819 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The City does not dispute that Plaintiffs engaged in protected activity by participating in the investigation into Harden. It contends, however, that Plaintiffs have failed to show that any of the purported retaliatory actions constituted adverse actions caused by Plaintiffs' participation in the investigation. This Court will address each set of allegations in turn.

### 1. Negative Performance Evaluation

Weide alleges retaliation in the form of his negative performance evaluation issued by Harden in September, 2024. The City counters that he has not alleged that that negative evaluation led to "a demotion, reduction in pay, or any disciplinary action." ECF 12-1 at 19. The City's argument reflects an outdated standard. Before the Supreme Court's decision in *Burlington Northern*, the Fourth Circuit had concluded that a poor performance evaluation was actionable only if the employer used it as a basis to negatively affect the terms and conditions of employment. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004). In *Burlington Northern*, however, the Supreme Court clarified that retaliation need not affect the terms and conditions of employment; rather, it need only be harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N*, 548 U.S. at 57, 64.

10

Since *Burlington Northern*, courts in this circuit have concluded that a negative performance evaluation could well dissuade a reasonable worker from supporting a charge of discrimination. *See, e.g.*, *Sharpe v. Prince George's Cnty. Gov't*, Civ. No. TDC-17-3799, 2021 WL 928177, at *17 (D. Md. Mar. 11, 2021) ("For purposes of a retaliation claim, a lower performance evaluation in and of itself can arguably dissuade a worker from engaging in protected activity."); *Dayse v. Roche*, No. 3:04-22462, 2006 WL 2927437, at *3 n.3 (D.S.C. Oct. 11, 2006) (rejecting argument that negative performance evaluation must detrimentally alter the terms and conditions of employment based on *Burlington Northern*). This Court agrees that a negative performance evaluation could well have such an effect.

Furthermore, the Fourth Circuit has determined that a causal link may exist when, despite a longer stretch of time between protected activity and adverse action, the adverse action occurs at a "natural decision point" following the protected activity. *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003). Thus, notwithstanding that Harden issued the negative performance evaluation four months after the investigation, the issuance of an annual evaluation represents a natural decision point. In light of the consequences that Harden faced because of the investigation, and therefore his motive to retaliate against Weide, and the fact that Harden provided no reasons or examples to support Weide's first negative evaluation in seventeen years, this Court concludes that Weide has plausibly alleged causation at this stage. Thus, Weide has sufficiently alleged retaliation in the form of his negative performance evaluation.

**2. Threats**

The complaint also alleges that immediately upon Harden's return to his position, he began using "threatening overtones" against Iliff. The complaint further alleges that Harden threatened Iliff, but it is not clear whether this incident was separate from the use of "threatening overtones"

immediately upon Harden's return. Nor does the complaint specify the content of any threat. Without additional factual allegations, this Court cannot evaluate any alleged threat against Iliff. The allegations concerning threats, as pled, therefore fail to state a retaliation claim.

### 3. Creation of Hostile Work Environment

Plaintiffs further allege that HR allowed rumors to spread about the investigation and that, on one occasion, a Sewer Department employee "act[ed] like he's sucking on a penis" as Weide walked by. Plaintiffs appear to allege that these actions constituted retaliation through the creation of a hostile work environment. To state such a claim, the plaintiff must show that "the retaliatory conduct (1) was unwelcome, (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination, and (3) can be attributed to the employer." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 218 (4th Cir. 2022). Plaintiffs have identified only one instance of unwelcome conduct from a Sewer Department employee, and, although that conduct was certainly improper, this Court cannot conclude that this single instance was so severe that it would dissuade a reasonable worker from supporting a charge of discrimination. These allegations therefore fail to state a claim for retaliation.

### 4. Unsafe Working Conditions

Plaintiffs also allege that they had to work under various unsafe conditions: performing brush cutting in snake-infested areas, handling hazardous paint without required personal protective equipment, riding in a lift bucket without OSHA-mandated training, working during heat advisories, cleaning camps that contained needles and human waste, and working a thirty-two-hour shift while one pump station was unmanned.

Plaintiffs do not identify when most of these events occurred, and, to the extent that they do, the events occurred well over two months past the investigation. The allegations that Plaintiffs

were required to perform work under unsafe conditions more than two months after the investigation do not, on their own, support a reasonable inference of a causal link between Plaintiffs' involvement in that investigation and the unsafe work. With respect to most of these allegations, Plaintiffs have also failed to identify who required them to perform the allegedly unsafe work, so this Court cannot evaluate whether the person or persons who did so might have had a motivation to retaliate for Plaintiffs' participation in the investigation. To the extent that Plaintiffs have identified an individual's involvement in these decisions, they have still failed to state a claim. For example, although the complaint identifies "Mr. Dawson" as the individual who instructed Iliff to remain in the heat but allowed another employee to come inside, the complaint contains no other reference to this individual, so this Court cannot infer that he even knew of Iliff's participation in the investigation. Furthermore, although the complaint references Harden's involvement in the use of hazardous paint, the complaint alleges only that he became angry when Plaintiffs requested personal protective equipment, not that he denied them use of it. Thus, none of Plaintiffs' unsafe working conditions allegations, as pled, suffice to state a claim.

5. **FMLA Leave**

Weide further alleges that the City retaliated against him by interfering with his use of FMLA leave. To the extent that the complaint provides dates for these events, the events all occurred at least two months after the investigation. Moreover, the complaint does not identify which individuals made these decisions or provide any other information to suggest that the decisions were motivated by retaliatory animus. Weide has therefore failed to plead that any of these decisions constituted retaliation.

13

### 6. Different Treatment from Sewer Department Employees

The complaint also alleges that Sewer Department employees received longer lunch breaks than those that Flood Department employees received. Again, the complaint does not allege who decided to treat the employees in the different departments differently in this way or when that person or those persons did so. Even assuming that receiving a shorter lunch break could constitute an adverse action, Plaintiffs have failed to allege causation.

### 7. Early Contract Termination

Iliff alleges that his contract was terminated early in September, 2024 and that in past years, he had always worked his full contract term. This action occurred four months after the investigation, and the complaint contains no other factual allegations suggesting that this action was motivated by retaliatory animus. Indeed, the complaint does not allege who made the decision to terminate his contract early. Thus, without additional factual allegations, this allegation also fails to state a retaliation claim.

### 8. Weide's Resignation

Weide also alleges that he resigned after his union voted to eliminate the Flood Department from its contract, requiring him to transfer to the Sewer Department. This decision occurred over a year after the investigation, and the complaint alleges no facts suggesting that the decisionmaker, the union, had any motivation to retaliate against Weide based on the investigation. This allegation also fails to state a claim.

### 9. Remaining Allegations

Finally, Plaintiffs' remaining purported adverse actions appear to constitute routine aspects of most workplaces. Plaintiffs allege that Harden and other supervisors began monitoring their work to a degree that they had not before the investigation, that they had to complete work plan

14

forms before Harden would then orally alter their assignments, and that, after Harden quit, Weide had to train his new supervisor and attend safety meetings with the Sewer Department. This Court cannot conclude that routine aspects of most workplaces, such as monitoring by supervisors, completing paperwork, or engaging in training and safety meetings, are harmful to the point that they could well dissuade an employee from engaging in protected activity. To the extent that Plaintiffs further allege that Harden altered their work assignments for the purpose of creating discrepancies to justify negative performance evaluations, this Court has determined that the negative performance evaluation alleged, against Weide, sufficiently states a claim for retaliation.

Thus, none of the allegations pertaining to Iliff suffice to plead a claim for retaliation. Nor is this Court persuaded that all of the actions allegedly taken against Iliff in combination sufficiently state a claim. As described above, the complaint fails to identify who took most of these actions, so this Court cannot conclude that they constitute a pattern of conduct all motivated by the same retaliatory animus. Accordingly, Iliff's retaliation claim, Count IV, will be dismissed without prejudice. Because only Weide's allegation regarding his negative performance evaluation suffices to plead a retaliation claim, this Court will grant in part and deny in part the City's motion to dismiss Weide's retaliation claim, allowing Count II to proceed to the extent that it is based on the negative performance evaluation.

## IV. CONCLUSION

For the reasons stated above, the City's motions, ECF 12, 13, will be granted in part and denied in part. Count IV will be dismissed without prejudice. A separate Order follows.

Dated: April 22, 2026 
_____/s/_____
Stephanie A. Gallagher
United States District Judge